**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

RICHARD WILSON,

                            Plaintiff,

         v.                                          No. 08-CV-509
                                                   (GLS/DRH)

KING, Sergeant, Upstate Correctional
Facility; JOHN DOE #1, Correction Officer,
Upstate Correctional Facility; JOHN DOE #2,
Correction Officer, Upstate Correctional
Facility; E. WEISSMAN, Dr., Upstate
Correctional Facility; ELLIS, Dr., Upstate
Correctional Facility; TICHENOR, P.A.,
Upstate Correctional Facility; and TRAVERS,
Nurse, Upstate Correctional Facility,

                           Defendants.[1]

_____

**APPEARANCES:**                   **OF COUNSEL:**

RICHARD WILSON
Plaintiff Pro Se
97-B-2800
Willard Drug Treatment Center
Post Office Box 303
7116 County Route 132
Willard, New York 14588

HON. ANDREW M. CUOMO         DEAN J. HIGGINS, ESQ.
Attorney General for the             Assistant Attorney General
  State of New York
Attorney for Defendants
The Capitol
Albany, New York 12224-0341

_____

     [1] Defendant corrections officers John Does 1 and 2 have neither appeared nor been served.  Fed. R. Civ. P. 4(m) requires that a complaint be served upon a defendant within 120 days after the complaint is filed or the complaint may be dismissed as to any unserved defendant without prejudice.  See also N.D.N.Y.L.R. 4.1(b). The complaint here was filed on May 9, 2008.  Compl.  No summons were served upon these defendants. More than 120 days have passed since the complaint was filed.  Accordingly, it is recommended that the complaint be dismissed as to these two defendants without prejudice pursuant to Rule 4(m) and Local Rule 4.1(b).

**DAVID R. HOMER**
**U.S. MAGISTRATE JUDGE**

**AMENDED REPORT-RECOMMENDATION AND ORDER**[2]

Plaintiff pro se Richard Wilson ("Wilson"), an inmate in the custody of the New York

State Department of Correctional Services ("DOCS"), brings this action pursuant to 42

U.S.C. § 1983 alleging that defendants, seven DOCS employees, violated his constitutional

rights under the Eighth Amendment.  Compl. (Dkt. No. 1).  Presently pending is defendants'

motion[3] for summary judgment pursuant to Fed. R. Civ. P. 56.  Dkt. No. 31.  Wilson failed to

respond to the motion.  For the following reasons, it is recommended that defendants'

motion be granted in part and denied in part.


**I. Failure to Respond**

Wilson did not oppose defendants' motion.  "Summary judgment should not be entered

by default against a pro se plaintiff who has not been given any notice that failure to

respond will be deemed a default." Champion v. Artuz, 76 F.3d 483, 486 (2d Cir. 1996).

Defendants provided such notice in their Notice of Motion here.  Dkt. No. 31-9.  Additionally,

the court also provided such notice, and granted two extensions of time for Wilson to file a

───────────────────

[2]This matter was referred to the undersigned for report and recommendation
pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

[3]The motion is made on behalf of all defendants except the two John Doe
defendants and Ellis.  As noted, the two John Doe defendants have never been served
with process.  Ellis has acknowledged service of process but has never answered or
otherwise appeared in the action.  Dkt. Nos. 15 (answer), 18 (Ellis' acknowledgement of
service), 31 (motion on behalf of other defendants).  Accordingly, it appears that Ellis is
presently in default.

response.  Dkt. Nos. 36, 39.  Despite this notice and these extensions, Wilson failed to

respond.  "The fact that there has been no response to a summary judgment motion does

not . . . mean that the motion is to be granted automatically."  <u>Champion</u>, 76 F.3d at 436.

Even in the absence of a response, a defendant is entitled to summary judgment only if the

material facts demonstrate his or her entitlement to judgment as a matter of law.  <u>Id.</u>; Fed.

R. Civ. P. 56(c).

    Wilson has not responded to raise any question of material fact, the facts as set forth in

defendants' submissions are accepted as true.  <u>See</u> <u>e.g.,</u> <u>Lopez v. Reynolds</u>, 998 F. Supp.

252, 256 (W.D.N.Y. 1997));  <u>see</u> <u>also</u> N.D.N.Y.L.R. 7.1(a)(3) ("<u>The Court shall deem</u>

<u>admitted any facts set forth in the Statement of Material Facts that the opposing party does</u>

<u>not specifically controvert.</u>") (emphasis in original).  However, Wilson was deposed in this

case (Dkt. No. 31-1)and also signed the complaint under oath.  Compl. at 13.    Such

documents must be considered in opposition to defendants' motion here.  <u>See</u> <u>Gayle v.</u>

<u>Gonyea</u>, 313 F.3d 677, 682-83 (2d Cir. 2002) (holding that prisoner's verified § 1983

complaint met requirement of Rule 56(e) that affidavits be made on basis of personal

knowledge, set forth facts that would be admissible in evidence, and demonstrate affiant's

competency to testify to matters in affidavit).


## II. Background

    All of the relevant events occurred during Wilson's incarceration at Upstate Correctional

Facility ("Upstate").

    Beginning on May 12, 2005, Wilson made requests to unidentified individuals to speak

with defendant King, a Sergeant at Upstate, to be moved from his cell because his cell

mate, Diaz, had "threatened [him] with physical violence, and was known to be assaultive . . . . racist . . . [and a member of] 'the Bloods' . . . .," but such requests were ignored.  Compl. ¶¶ 6, 8; <u>see</u> <u>also</u> Wilson Dep. at 11-12.  King was never personally informed that Wilson was having trouble with Diaz.  King Decl. (Dkt. No. 31-5) ¶ 14.  On May 12, 2005, Diaz assaulted Wilson because Wilson, due to a back condition for which he failed to receive a lower bunk order,[4] was laying on his mattress, on the ground, and blocked the recreation pen door from opening.  Compl. ¶¶ 7-8; Wilson Dep. at 13.  Over the next few weeks, tensions escalated and Wilson's requests were still ignored.  Compl. ¶ 9; Wilson Dep. at 14.

On the morning of May 27, 2005, Diaz again assaulted Wilson, striking him with his feet and fists.[5]  Compl. ¶ 10; Wilson Dep. at 14-16, 21-22.  Wilson was found shortly thereafter by corrections officers and was transported to the infirmary whereupon he told the officers he had slipped, fallen, and hit his back on his toilet.  Compl. ¶¶ 11-12; Wilson Dep. at 22-23; Dkt. No. 31-4 at 71, 125.  It is uncontested that Wilson initially lied, but that he did so for fear of further reprisals by Diaz.  Compl.  ¶ 12; Dkt. No. 31-4 at 3.

Wilson was initially seen by defendant Travers, a nurse, to whom he "stated that when he bent over his back went out."  Dkt. No. 31-4 at 16, 68; <u>see</u> <u>also</u> Tichenor Decl. (Dkt. No. 31-6) ¶ 9; Travers Decl. (Dkt. No. 31-7) ¶ 4.  Travers referred Wilson to defendant Tichenor,

---

[4] In Wilson's correspondence grieving the actions of May 27, he also stated that Tichenor violated his Eighth Amendment by "den[ying him] a bottom bunk."  Dkt. No. 31-4 at 4; <u>see</u> <u>also</u> Dkt. No. 31-4 at 37 (grievance dated May 8, 2005 requesting bottom bunk order for Wilson's multiple medical problems including is "herniated disc [and] pinched nerves in [his] back.").  Wilson filed a grievance about the matter, but it was denied because diagnostic testing revealed normal results regarding his back.  Dkt. No. 31-4 at 4, 38.  Wilson's appeal was denied, again citing his normal test results and Wilson's ability to request pain medication to manage his symptoms.  Dkt. No. 31-4 at 39-41.

[5] Diaz denied the assault occurred.  Dkt. No. 31-4 at 6, 7, 20.

a physician's assistant. Dkt. No. 31-4 at 16, 68; Travers Decl.  ¶ 5.  Wilson had previously

been treated by Tichenor at the nurses' station for "lower back injuries [including] . . .

herniated disks . . . [and] spurs in [his] spine from prior fractures."  Wilson Dep. at 24.

Tichenor had previously denied Wilson his lower bunk permit and refused to treat his

complaints of chronic pain with anything other than Tylenol.  Wilson Dep. at 24.

   Upon arrival at the station, Wilson told Tichenor that he was "having a lot of pain in [his]

lower back," so Tichenor began performing stress exams to evaluate the strength and

flexibility in his feet and legs. Id. at 27, 68.  During the examination, Wilson failed to

cooperate, "refus[ing] a range of motion exam of his back."  Tichenor Decl. ¶ 11.  Tichenor

had been told by the corrections officers who were escorting Wilson that he had fallen in his

cell and injured his back when he hit his toilet.  Wilson Dep. at 27.  Tichenor concluded that

Wilson was objectively fine, diagnosed him with a lower back strain, prescribed a muscle

relaxant, and concluded he should return to his cell. Id. at 27-28; Tichenor Decl. ¶ 12.  At

this point, Wilson told Tichenor that he was assaulted by his cell mate, had been kicked and

hit repeatedly in his back and stomach, and was in a lot of pain.  Compl. ¶ 14; Wilson Dep.

at 28-30; Dkt. No. 31-4 at 4-5 (detailing that upon arriving at the nurses' station Wilson

"immediately reported [to medical] that [his] bunkie had assaulted [him]," and repeatedly

complained of "intense pain in [his] lower left back/lower left abdomen area." ).  "Tichenor

stated that during this exam Wilson never stated to her that he was punched in the back

until the exam was completed and he refused to return to his cell;" however, his "injury [wa]s

not consistent with the inmate's statement of being punched in the back."  Dkt. No. 31-4 at

16; see also Dkt. No. 31-4 at 9 (memorandum from Tichenor stating that Wilson

"complained of lower back pain," his diagnostic tests were normal, she felt there was

nothing wrong with him, and there was no examination of his abdomen because "he did not complain of abdominal pain."); Dkt. No. 31-4 at 74, 128 (memorandum from Tichenor to Smith detailing that Wilson "complained of low back pain," so his abdomen was not examined and that he initially lied about his injuries); but see Tichenor Decl. ¶ 13 ("After [Wilson] left the medical room with the officers, he refused to go back to his cell and claimed that his cell mate had punched him in the back."). Medical records indicated "[n]o visible bruising or marks," though Wilson remained fully clothed during the examination. Dkt. No. 31-4 at 18, 68; Tichenor Decl. ¶ 14.[6]

Tichenor instructed the corrections officers to return Wilson to his cell.  Compl. ¶ 15; Wilson Dep. at 28-29.   Tichenor's shift concluded at 9:00 a.m., after Wilson was returned to his cell.  Tichenor Decl. ¶ 15.  On the way back to his cell,  Wilson requested to speak with King and was placed in a holding area.  Compl. ¶¶ 16-17; Wilson Dep. at 30-31; King Decl. (Dkt. No. 31-5) ¶ 6.  King spoke with Wilson and granted a cell transfer for Wilson to a bottom bunk.  Compl. ¶ 18; Wilson Dep. at 32-33; King Decl. ¶ 11.  Wilson contends that he generally and continually complained of intense pain to unnamed corrections officers; however, King states, and the record does not dispute, that Wilson never told King that he was having difficulty breathing or felt extremely ill  Compl. ¶ 18; Wilson Dep. at 31; King Decl. ¶ 7.  Wilson walked from the holding area to his new cell on his own accord.  King Decl. ¶ 12.

During lunch and throughout the afternoon, while in his new cell, Wilson repeatedly

_____

[6] Included in defendants' submissions was an inmate injury report dated June 1, 2005 which stated that Travers examined Wilson in his boxers and saw no notable injuries.  Dkt. No. 31-4 at 35.

requested that the officers on rounds take him back to the infirmary.  Compl. ¶ 19-20;

Wilson Dep. at 33-36.  For approximately six hours his requests were unheeded.  Compl.

¶ 19-20; Wilson Dep. at 33-37.  At dinner, a corrections officer found Wilson laying

unconscious on the floor.  Compl. ¶ 21; Wilson Dep. at 35-39.  Medical attention was

summoned to Wilson's cell where he was eventually awakened by Travers.[7]  Compl. ¶ 23;

Wilson Dep. at 39-42; Travers Decl. ¶¶ 8-9.  Wilson was taken to the infirmary whereupon

he was approved for transfer to Alice Hyde Medical Center.  Compl. ¶¶ 24-25.  At this time,

Travers was still involved in Wilson's care, monitoring his blood pressure and other vitals

and applying an oxygen mask.  Wilson Dep. at 45-46; Travers Decl. ¶ 12.  While Wilson

never met the physician who was on duty and approved his transfer to the hospital, he

testified that Dr. Ellis, a defendant,[8] was responsible for making that decision.  Wilson Dep.

(Dkt. No. 31-3) at 8-10.  Dr. Ellis made the decision via telephone, pursuant to a

telemedicine conference, from his place of employment in Buffalo, New York.  Dkt. No. 18-

1; see also Tichenor Decl. ¶ 20 (indicating telemedicine conference occurred prior to

transfer to Alice Hyde); Weissman Decl. (Dkt. No. 31-8) ¶¶ 6-8.

Upon arrival at Alice Hyde, it was discovered that Wilson required a blood transfusion

and emergency surgery because his spleen was ruptured.  Compl. ¶¶ 25-28; Tichenor Decl.

---

[7] It is undisputed that Travers used smelling salts in reviving Wilson.  Wilson Dep. at 41-43.  However, Travers denies Wilson's testimony that she was slapping him across the face or shoving smelling salts up his nose in attempts to wake him.  Wilson Dep. at 41; Tavers Decl. ¶ 10.

[8] See note 3 supra.

7

¶¶ 21-22.[9]  A ruptured spleen may occur from a blow to the abdomen or ribs surrounding the abdomen.  Dkt. No. 31-4 at 9, 74.  Wilson attributes this injury to the attack he suffered from Diaz.  Wilson Dep. at 64.  Dr. Aronis, a previously terminated defendant, performed the surgery.  Compl. ¶¶ 27-30.  Wilson remained at Alice Hyde for approximately eleven days prior to his discharge back to Upstate.  Compl. ¶ 31; Wilson Dep. at 47.  While in the, hospital, Wilson received a Demerol pump for pain, but was told that upon arrival at Upstate he would begin receiving Percocet.  Compl. ¶ 31.  Wilson was also instructed "to take daily showers to enable him to properly cleanse his surgical area . . . to help circumvent the possible risk of infection . . . ."  Id. ¶ 31; see also Wilson Dep. at 50.

Upon arrival at the Upstate's infirmary, Wilson was not permitted to take a shower for four days and only received Tylenol for pain from Drs. Ellis and Weissman, also a defendant herein, as well as Travers and Tichenor.  Compl. ¶¶ 32-33; Wilson Dep. at 50; but see Dkt. No. 31-4 at 69 (explaining that the infirmary has daily showers available and that no order for daily shower after discharge from the infirmary was given).  Wilson complained that the Tylenol was not adequately controlling his pain, but his complaints were ignored by the infirmary.  Compl. ¶¶ 35-36; Wilson Dep. at 54-56, 61.[10]  Wilson requested, and was provided, Tylenol #3 ever four hours as needed.  Dkt. No. 31-4 at 69.  Wilson received pain medication on June 9, 10, 12, 15 and 16 without any further

---

[9] Wilson's medical records were filed under seal.  The records are divided into two exhibits.  The first deals with Wilson's admittance to Alice Hyde whereupon intake records confirm Wilson's contentions of complaints of abdominal pain and conclude that he had a ruptured spleen which required emergency surgery.

[10] Submitted medical records indicate that Wilson regularly received both tylenol and ibuprofen for pain.

8

complaints that the medication he was receiving was inadequate.  Dkt. No. 31-4 at 69.

However, Wilson contends that he complained to Dr. Weissman that he required a

prescription pain killer to relieve his pain, but such requests were denied.  Wilson Dep. at

55-56, 61-62.  Dr. Weissman does not acknowledge that this event happened, and

indicates that she only saw Wilson once, on June 8, 2005, when she wrote him an order for

a prescription and discharge orders from the infirmary.  Weissman Decl. ¶ 12.  Wilson

remained in the infirmary for approximately one week.  Wilson Dep. at 52.  When Wilson

left the infirmary, he did so on his own accord without any assistive devices.  Id. at 57.

Wilson was housed in a different cell and never saw Diaz again.  Id. at 57-58.

Wilson authored a letter on June 12, 2005 to the Superintendent of Upstate detailing

the events occurring prior and subsequent to the alleged attack on May 27, 2005.  Dkt. No.

31-4 at 12-15.  On August 4, 2005, Wilson received a response explaining that his

complaint had been investigated and found to be without merit.  Dkt. No. 31-4 at 7, 46, 138.

Throughout the investigation, multiple interviews occurred.  Tichener reported that Wilson's

stomach was not examined while he was in the nurses' station because "he did not

compl[ain] about abdominal pain."  Dkt. No. 31-4 at 8, 72, 126; see also Dkt. No. 31-4 at 9

(memorandum from Tichenor stating that Wilson "complained of lower back pain," his

diagnostic tests were normal, she felt there was nothing wrong with him, and no

examination of his abdomen was done because "he did not complain of abdominal pain.").

Moreover, defendant King had no recollection of the incident.  Dkt. No. 31-4 at 8, 72, 126;

Dkt. No. 31-4 at 10 (memorandum from King stating that he did "not recall the exact specific

reason for his cell move," but assumed it was probably due to "his complaints about his

health and inability to get up onto the top bunk.").  The August 4 response indicated that

Diaz denied ever assaulting Wilson, Wilson's actions of "initially fabricating the story of how [he was] injured, and subsequent personnel actions of sending Wilson to a different cell and providing him further medical attention failed to "substantiate allegations of inappropriate behavior by medical and/or security staff in handing th[e] incident." Id. Wilson responded on August 7, 2005, again explaining the reasons for his initial lie, the incredibility of Diaz's responses, and the deliberate indifference displayed by staff. Dkt. No. 31-4 at 3-6.

Wilson also filed an inmate grievance on July 29, 2005, stating that he was subjected to medical and facility wrongdoings that resulted in him being assaulted and almost killed. Dkt. No. 31-4 at 49, 103-07.[11] Wilson's grievance and appeal were both denied based upon an investigation which concluded that there was no evidence to support Wilson's allegations of misconduct. Id. at 43, 49, 53, 56-57, 83-88, 107-11, 115-23. Wilson also filed another grievance on August 5, 2005, seeking medical attention from someone other than Tichenor as she was incompetent and unable to adequately treat his chronic back pain. Id. at 91-92. The grievance was denied, citing Tichenor's long history of treating Wilson and finding nothing objectively wrong with him and Wilson's history of drug abuse and polypharmacy as support for Tichenor's recurrent decision to "refrain from [prescribing narcotic pain] . . . medication as much as possible." Id. at 93.[12] The grievance was appealed, and the appeal was denied. Id. at 89-101. This action followed.

---

[11] Wilson initially filed a grievance on June 19, 2005 which was not received. Dkt. No. 31-4 at 59, 113. Accordingly, Wilson was granted leave to resubmit the grievance, which occurred on June 29, 2005. Id. at 58-59, 112-13. Wilson also grieved the facility's failure to respond to his initial grievance on June 25, 2005. Id. at 70, 124.

[12] Wilson's medical records include Ambulatory Health Record entries subsequent to his splenectomy. The records indicate that Wilson continued to use drugs while incarcerated and required rehabilitation.

### III.  Discussion

Wilson contends that his Eighth Amendment rights were violated when defendants were deliberately indifferent to his serious medical needs regarding his ruptured spleen. Liberally construing Wilson's complaint, he has also alleged that defendant King failed to protect him from Diaz in contravention of the Eighth Amendment.  Defendants contend that Wilson's constitutional claims are meritless, he has failed to establish Dr. Weissman's personal involvement, and they are entitled to qualified immunity.

### A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Facts are material if they may affect the outcome of the case as determined by substantive law.  Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).  All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party.  Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  It must be apparent that no rational finder of fact

could find in favor of the non-moving party for a court to grant a motion for summary judgment.  Gallo v. Prudential Residential Servs. 22 F.3d 1219, 1223-24 (2d Cir. 1994); Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1988).

When, as here, a party seeks dismissal or summary judgment against a pro se litigant, a court must afford the non-movant special solicitude.  See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006); see also Sealed Plaintiff v. Sealed Defendant #1, 537 F.3d 185, 191 (2d Cir. 2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds *pro se*, ... a court is obliged to construe his pleadings liberally.'" (citations omitted)).  However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion; the requirement is that there be no genuine issue of material fact.  Anderson, 477 U.S. at 247-48.

### B. Personal Involvement

"'[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'"  Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (quoting Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir. 1991)).  Thus, supervisory officials may not be held liable merely because they held a position of authority.  Id.; Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996).  However, supervisory personnel may be considered "personally involved" if:

> (1) [T]he defendant participated directly in the alleged constitutional violation;
>
> (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;

12

> (3) the defendant created a policy or custom under which
> unconstitutional practices occurred, or allowed the continuance of
> such a policy or custom;
>
> (4) the defendant was grossly negligent in supervising subordinates
> who committed the wrongful acts; or
>
> (5) the defendant exhibited deliberate indifference to the rights of
> inmates by failing to act on information indicating that
> unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (citing Williams v. Smith, 781 F.2d 319,

323-24 (2d Cir. 1986)).

Defendants contend that Dr. Weissman's only involvement in the present case was

being named due to her position as medical director at Upstate.  Defs. Mem. of Law (Dkt.

No. 31-10) at 5.  However, Dr. Weissman's declaration indicates that she saw Wilson in

June of 2005, while he was recovering from his surgery in the Upstate infirmary.  Weissman

Decl. ¶ 12.  During this time, Wilson was allegedly complaining of the inadequate pain relief

he was being provided, he contends he spoke with Weissman about this, and Weissman

ordered his discharge from the infirmary thus confirming that the two had a discussion while

he was post-operatively in the infirmary.  Wilson Dep. at 55-56, 61-62.  Therefore, viewing

the facts in the light most favorable to Wilson, he has raised an issue of fact whether Dr.

Weissman was directly involved in the purported constitutional violation of failing to treat his

ruptured spleen.

Accordingly, defendants' motion for summary judgment on this ground should be

denied.

## C. Eighth Amendment

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. Const. amend. VIII.

### 1. Medical Care

This prohibition extends to the provision of medical care. Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994). The test for a § 1983 claim is twofold. First, the prisoner must show that the condition to which he was exposed was sufficiently serious. Farmer v. Brennan, 511 U.S. 825, 834 (1994). Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm. Id. "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." Id. at 844.

"'Because society does not expect that prisoners will have unqualified access to healthcare,' a prisoner must first make [a] threshold showing of serious illness or injury" to state a cognizable claim. Smith v. Carpenter, 316 F.3d 178, 184 (2d Cir. 2003)(quoting Hudson v. McMillian, 503 U.S. 1,9 (1992)). Because there is no distinct litmus test, a serious medical condition is determined by factors such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain." Brock v. Wright, 315 F.3d 158, 162-63 (2d Cir. 2003) (citing Chance, 143 F.3d 698, 702 (2d Cir. 1998)). The severity

14

of the denial of care should also be judged within the context of the surrounding facts and circumstances of the case.  Smith, 316 F.3d at 185.

Deliberate indifference requires the prisoner "to prove that the prison official knew of and disregarded the prisoner's serious medical needs."  Chance, 143 F.3d at 702.  Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed."  Estelle v. Gamble, 429 U.S. 97, 104 (1976).  "Mere disagreement over proper treatment does not create a constitutional claim" as long as the treatment was adequate.  Chance, 143 F.3d at 703.  Thus, "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists . . .  are not adequate grounds for a section 1983 claim."  Sonds v. St. Barnabas Hosp. Corr. Health Servs., 151 F. Supp. 2d 303, 312 (S.D.N.Y. 2001).  Furthermore, allegations of negligence or malpractice do not constitute deliberate indifference unless the malpractice involved culpable recklessness.  Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1996).

In this case, defendants do not appear to challenge the fact that a ruptured spleen is a serious medical need.  However, defendants contend that they were not deliberately indifferent to that condition at any time, including subsequent to Wilson's spleenectomy when he was returned to the Upstate infirmary.

### a. Dr. Weissman

Dr. Weissman's actions in allegedly failing to provide Wilson with requested narcotic pain medication subsequent to his surgery is insufficient to sustain an Eighth Amendment claim.  Viewing the facts in the light most favorable to Wilson, Dr. Weissman's actions in

15

agreeing to provide Wilson only with Tylenol and Ibuprofen during his surgical recovery amount to nothing more than a difference of opinion over treatment.  Wilson Dep. at 54-56. Such differences in opinion are insufficient to state an Eighth Amendment claim.  Sonds, 151 F. Supp. 2d at 312.  As explained below, Wilson was receiving adequate treatment as he was consistently being provided with pain medication.  Chance, 143 F.3d at 703. Wilson's preference for a different pain medication fails to establish an Eighth Amendment allegation.

Furthermore, it is undisputed that Wilson was being provided Tylenol or Ibuprofen every four hours as needed, and when requested.  Dkt. No. 31-4 at 69.  Wilson's complaints of chronic and unbearable pain are belied by the medical records which indicated that pain medication was frequently being dispensed throughout the day and that Wilson did not complain, at that time, of any issues with his pain relief.  Id.  The constant provision of such medication is also inconsistent with allegations of deliberate indifference or malicious and wanton conduct.

Accordingly, defendants' motion for summary judgment should granted on this ground as to Dr. Weissman.

### b. Tichenor

Viewing the facts in the light most favorable to Wilson, it appears that he has raised a sufficient question of material fact regarding Tichenor's deliberate indifference.  Upon arriving at the nurses' station, Wilson was examined based on his assertion that he had slipped, fallen, and hit his back.  Wilson Dep. at 27.  However, crediting Wilson's recitation

16

of the facts as true, he informed Tichenor that he actually had been assaulted by his cell

mate and was experiencing pain in his back and abdomen.  Compl. ¶ 14; Wilson Dep. at

28-30; Dkt. No. 31-4 at 4-5. According to Wilson, Tichenor discredited Wilson's new

complaint without examination and directed he return to his cell.  The medical records do

not indicate any bruising.  Dkt. No. 31-4 at 18, 68; Tichenor Decl. ¶ 14.  However, the

records were created by Tichenor and thus reflect her version of events as Wilson's

complaint reflects his.  Such conflicts in evidence cannot be resolved on a motion for

summary judgment and require a determination of credibility by a factfinder.  See Kaytor v.

Elec. Boat corp., 609 F.3d 537, 545-46 (2d Cir. 2010).

The fact that Tichenor refused to reexamine Wilson and sent him back to his cell

injured and with a potentially abusive cell mate after she was informed that Wilson was

engaged in a fight and had pain in his mid-section suffices to raise a question of fact as to

whether her actions were malicious and wanton.  Tichenor's responsibility was to assess

Wilson for any injury.  This responsibility remained whether or not Wilson initially lied about

the circumstances which brought him to the infirmary.  Viewing the facts in the light most

favorable to Wilson, the failure of Tichenor to examine Wilson further and ensure that his

mid-section was uninjured appear to be punitive because of his initial lie.  Such a punitive

refusal to treat would elevate mere negligence into culpable recklessness.  Hathaway, 99

F.3d at 553.

Therefore, with respect to Wilson's claim that Tichenor refused and delayed his

treatment of his ruptured spleen, defendants' motion on this ground as to Tichenor should

be denied.  However, as to any claim that Tichenor subsequently denied Wilson pain

medication after his surgery, such a claim is without merit for the reasons discussed above

and, accordingly, defendants' motion as to Tichenor on that claim should be granted.

**c. Travers**

Travers neither deliberately denied nor delayed treatment either time that she saw Wilson.  When Travers first saw Wilson, she was informed that he had injured his back due to a fall in his cell and she referred his case immediately to Tichenor.  Dkt. No. 31-4 at 16, 68; Travers Decl. ¶ 4; Tichenor Decl. ¶ 9.  These actions in compiling the medical history and immediately referring Wilson to another medical professional do not represent actions of deliberate indifference.

Additionally, when Travers was summoned to Wilson's cell because he was unresponsive, she successfully awoke Wilson, stabilized his vitals, applied oxygen, and directed him to the infirmary for further consultation and decision.  Travers Decl.  ¶¶ 8-10, 12; Wilson Dep. at 45-46.  Travers provided prompt medical attention and referred Wilson's case to those with the appropriate medical authority for further care.  These actions are inconsistent with Wilson's allegations of denying or delaying treatment.  Moreover, while Wilson contends that Travers was shoving the smelling salts up his nose and slapping him against the face, such contentions are belied by the fact that Wilson was unconscious and not in a stable state of mind due to his serious health problems.  Even if such actions were true, they are at best a negligent means of awakening a critically ill patient whose subjective complaints are essential for appropriate care and treatment.  Hathaway, 99 F.3d at 553.  Such negligent actions are insufficient to state a claim upon which relief may be granted.  Id.  Furthermore, to the extent that Travers allegedly denied Wilson subsequent pain medication after his surgery, such contentions are without merit for the reasons discussed

18

above.

Accordingly, defendants' motion on this ground as to Travers should be granted.


### d. King

King was not involved in any of Wilson's medical treatment.  King spoke with Wilson after he left the nurses' station and sent him to his own cell, approving Wilson's ongoing requests for a new cell and bottom bunk.  King did not see Wilson again, and was never informed of Wilson's continued pain; thus, it cannot be said that he had any part in deliberately denying or delaying treatment as he was not involved.  King Decl. ¶¶ 7, 11; Compl. ¶ 18; Wilson Dep. at 31-33. Accordingly, defendants' motion on this ground as to King should be granted.


### 2. Failure to Protect

The Eighth Amendment also obliged defendants to protect Wilson from known harms. Farmer v. Brennan, 511 U.S. 825, 829 (1970). "The Constitution does not mandate comfortable prisons but neither does it permit inhumane ones, and it is now settled that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment."  Farmer, 511 U.S. at 832.  Where the inmate is alleging "a failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm."  Farmer, 511 U.S. at 834 (citing Helling v. McKinney, 509 U.S. 25, 31-32 (1993)).

As with other Eighth Amendment claims, a "plaintiff must satisfy both an objective . . .

19

and subjective test." <u>Jolly v. Coughlin</u>, 76 F.3d 468, 480 (2d Cir. 1996) (citations omitted). To state a cognizable failure to protect claim, (1) "the inmate [must be] incarcerated under conditions imposing a substantial risk of serious harm," and (2) the prison office must "know of and disregard an excessive risk to inmate health and safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." <u>Matthews v. Armitage</u>, 36 F. Supp. 2d 121, 124-25 (N.D.N.Y. 1999) (internal citations and quotations omitted).

Liberally construing Wilson's complaint he alleges that King failed to protect him from Diaz because he did not transfer Wilson out of his cell sooner. However, Wilson never states, nor does the record support the assumption that, King was ever notified of the threat of harm to Wilson's safety. Wilson stated that he asked to speak to King, but that these requests went unfulfilled. Compl. ¶¶ 6, 8; Wilson Dep. at 11-12. Additionally, King asserts without contradiction that he was never apprised of the tensions between Diaz and Wilson. King Decl. ¶ 14. Thus, these allegations are insufficient to state an Eighth Amendment claim because Wilson has failed to proffer facts sufficient to establish the subjective prong of the analysis.

Accordingly, defendants' motion on this ground as to King should be granted.


### 3. Qualified Immunity

Defendants also contend that they are entitled to qualified immunity. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable

20

person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Aiken v. Nixon, 236 F. Supp. 2d 211, 229-30 (N.D.N.Y. 2002) (McAvoy, J.), aff'd, 80 Fed.Appx. 146 (2d Cir. Nov. 10, 2003).  However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights . . . immunity might still be available as a bar to . . . suit if it was objectively reasonable for the public official to believe that his acts did not violate those rights."   Kaminsky v. Rosenblum, 929 F.2d 922, 925 (2d Cir.1991) (citations omitted).

A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation. Saucier v. Katz, 533 U.S. 194, 201 (2001).  Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights, of which a reasonable person would have known, were clearly established at the time of the alleged violation. Aiken, 236 F. Supp. 2d at 230.  Here, the second prong of the inquiry need not be reached as to Dr. Weissman, Travers, or King because, as discussed supra, accepting all of Wilson's allegations as true, he has not shown that any of these defendants violated his constitutional rights.

However, with respect to Wilson's claims against Tichenor for her refusal and delay in treating Wilson, the second prong of the analysis need be considered.  There is no question that it was well settled on May 13, 2008 that the Eighth Amendment required that inmates are to be provided "with . . . reasonable safety [as i]t is cruel and unusual punishment to hold convicted criminals in unsafe conditions," (Helling, 509 U.S. 33 (internal quotation marks and citations omitted)) whether that pertain to their medical care, conditions of confinement, or expectation for protection from corrections staff from dangerous situations. Thus, accepting Wilson's allegations as true, qualified immunity cannot be granted to

21

Tichenor for her initial involvement in examining Wilson and sending him back to his cell with a ruptured spleen.

Accordingly, it is recommended in the alternative that defendants' motion on this ground be denied as to Tichenor's actions in screening Wilson and granted as to all defendants in all other respects.

## IV.  Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that:

1. Defendants' motion for summary judgment (Dkt. No. 31) be:

A. **DENIED** as to Wilson's claim that Tichenor refused and delayed treatment for Wilson's ruptured spleen in violation of Wilson's Eighth Amendment rights and **GRANTED** as to all other claims against Tichenor; and

B. **GRANTED** as to King, Dr. Weissman, and Travers as to all claims against them; and

2. The complaint be **DISMISSED** without prejudice as to defendants John Doe #1 and John Doe #2.[13]

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court "within fourteen (14) days after being served with a copy of the . . . recommendation."  N.Y.N.D.L.R. 72.1(c) (citing 28 U.S.C. §636(b)(1)(B)-(C)).  **FAILURE TO OBJECT TO THIS REPORT WITHIN**

---

[13]If the recommendations herein are adopted, the only claims remaining will be (1) those against Tichenor for misdiagnosing and delaying treatment of Wilson's ruptured spleen, and (2) all those against Dr. Ellis (see note 3 supra).

**FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** <u>Roldan v. Racette</u>, 984

F.2d 85, 89 (2d Cir. 1993); <u>Small v. Sec'y of HHS</u>, 892 F.2d 15 (2d Cir. 1989); 28 U.S.C. §

636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated:  August 23, 2010
      Albany, New York

                    David R. Homer
                    U.S. Magistrate Judge

23